Stermer v. Old Republic National Title Insurance Company We're going to wait just a moment until the courtroom is settled and we can focus all of our attention on you, Mr. Pollenberg. Is that right? Very good. All right. Only because one of my favorite professors in college was named Pollenberg. Up in Cornell. Yes. History professor. Yes. All right. We'll hear from Mr. Pollenberg. May it please the court. John Pollenberg on The creditor trustee appeals the trial court's decision to exclude the expert at the REV hearing under 702 after the case was submitted for decision. The creditor trustee appeals also the various motions for summary judgment because the record reflects disputed issues and material facts. I'm going to start with the fraudulent transfer because I think that's the one that encompasses most of the issues. I don't think there's much of a dispute that the trial court found under the crime fraud ruling that there was actual fraud. Fraudulent intent occurred and so a fraudulent transfer occurred. What the damages are that flowed from that is kind of what the REV hearing was going to determine. I just first want to understand the timeline. The transfer started in 2009, right? And then the receivership is 2015 or it I thought that there was a significant gap between the transfer and when the debtor could no longer sustain itself. Okay. So the transfer was in 2015 under the master agreement. I think your honor you're referring to the joint venture agreement that was entered in 2009 that was amended in 2011. Okay. So the joint venture agreement formed, which is the other part, the successor liability piece, was formed in 2009. As part of that joint venture agreement, the debtor then was called attorney's title insurance fund. The debtor contributed its title plan to the joint venture, a copy of its title plan and retained rights to that title plan. The trial court, although the trial was only supposed to be on the reasonable equivalent value issue, the trial court decided to bifurcate that once again and hold a rights trial on the first, what amounted to first two days and then have the valuation for the reasonable equivalent value decided on the following three or four days. And so trial court decided that the debtor did have rights. Those rights were transferred on the consummation of the master agreement. So with that, okay, under the crime fraud ruling, there were badges of fraud that had occurred. That transfer occurred. Trial happened. I'm sorry. Before the trial, there was a Dauber hearing on the defendant's motion to exclude our expert. The court said, yes, I'm part of it, what's called the option to reemerge. The trial court said no on the rest. So not only did the trial court say no, but the trial court said Mr. Pfeiffer is admissible to testify. We have one ruling on admissibility. We go to trial and then after the parties rest, the bankruptcy court takes the matter behind, wearing the trial court's prior effect hat now, and makes an evidentiary ruling to exclude the evidence by Pfeiffer. Now that exclusion occurred without a motion from the defendants. Under 104, you would expect that if there was going to be an objection as to admissibility, that would occur before, during trial, before the case was submitted for decision so that the proponent of that expert could make the record, either cure whatever it was that the objection was going to be, or make the record so that we would have this issue for your honors in a different context. But that never happened. So what happened was we ended up with no expert for value. And it's not hard to predict, once you take out the expert for value, how the decision is going to come out. No reasonable equivalent value on the intangible assets. I'm sorry, reasonable equivalent value on the intangible assets because we failed to meet our burden of understanding that your expert's opinion didn't match the data available to him and that part of the analysis included assets that the debtor really didn't have. Is that not correct? I don't understand that to be the trial court's ruling. What the trial court decided on the first couple of days in an interim order was that the debtor had the assets. You may be referring to the intellectual property ruling, but that revolves around a 15B decision that was made during trial. So we were putting in evidence about a transfer for intellectual property, separate from the title plan, which was one of the components of intangible asset. Okay, so the intellectual property transfer was an immediate transfer that we hadn't pled in the pleading, but we brought it up in every response to interrogatory. It was a disputed issue of fact in the stipulations. It was raised all the way through the case. Once the defendants made an objection, Dan Sturmer made a 15B motion to amend the pleadings to conform to the evidence that we proffered, and that was in the record. Court didn't rule a trial on that, and this is one of those issues that gets compounded when you bifurcate a case into so many tiny segments. The evidence becomes disjointed, and relevancy rulings, because it's not relevant now, it may be relevant later, resulted in the court, after trial had concluded, denying the 15B motion and then saying, because we denied the 15B motion, you can't win on summary judgment, which was still pending when we started trial, you can't win on summary judgment on this immediate transfer issue. Your Honor, I hope that it's all bound up in this heavily bifurcated trial. The fact is that the expert got excluded without notice. Were you going to ask me a question, Your Honor? No, I'm sorry. Go ahead. Keep going. All right. Then we move over to the other side of the case. This is the successor liability slash alter ego case. This is against a separate set of defendants, all related to one another. The case was that Attorney's Title Fund Services, what we call ATFS, was the successor liability, either mere continuation or de facto merger. That was decided on summary judgment. The facts in the record raise significant issues as far as how the court could make that decision on summary judgment. This is another area. Correct me on the record. It was my understanding that even though, I guess, ATFS inherited employees and might have inherited office space, they didn't share the same assets. They weren't owned by the same entity. What else did you have to suggest alter ego? Okay. Alter ego, let me try to chart it out. This case is a course in complicated corporate organization charts. You have Attorney's Title Fund Services formed in 2009. The members are Old Republic Holding and ATF, the debtor. Attorney's Title Fund Services eventually had Old Republic Companies as an intermediary company added to that structure. Then when ATF Services, Old Republic Company, Old Republic Holdings, all of which were parent subsidiary relationships. The alter ego piece had to do with the way Old Republic Holdings and Old Republic Companies treated ATFS. The issue about assets, same assets, that's the successor liability. A successor liability claim is a totality of the circumstances analysis. It's not like a breach of contract claim where you say, hey, you have to have a contract, has to be enforceable, has to be a breach, has to cause damages. You check the box. You have to prove each one of those elements. The successor liability claim, mere continuation or de facto merger, is a totality of the circumstances analysis where the question that you're answering is, is ATF Services a mere carrying the baton from the predecessor? ATF Services called itself the fund. If you've been in Florida for decades before 2009, the fund was the number one title company in Florida, not by a little, by a lot. There's a reason for it because all the title agents in the fund had to be lawyers. Lawyers do closings. Lawyers get a commission for doing title policies, so it made sense. That had a lot of value. When the fund fell into trouble in 2009 with the financial crisis, they moved it over to ATF Services. By it, I mean the entire business except writing title. The company that issued title was over a public title. Now, the employees that were in the fund, I don't want to get into a materiality argument because I saw how well that worked in the previous one, but virtually all the employees, the ones that they wanted to move over, moved over from the fund to ATFS. The building where they were was the fund. It said the fund. They didn't change the sign. It's the fund. All the services that the fund performed before were the services that ATFS performed after. Everything was the same. So why did they do that? They wanted to extract that market. It was very valuable, but what didn't they want? They didn't want the liability. That is what successor liability claims attempt to resolve. The trial court could have found successor liability and not found alter ego, but it can't find no successor liability and then find alter ego because the way we deal with alter ego is we don't want to have alter ego on the successor liability claim. Okay. My last question for the record, if you can clarify for me, because it's my understanding that the Florida Office of Insurance Regulation approved something. Maybe it was the joint venture agreement or it was this transfer. What did they approve and is it true that the district court or the bankruptcy court and then the district court heavily relied on that approval from this agency to find that there wasn't any misconduct? Okay. Well, entity misconduct is kind of challenging for me because that doesn't fall within any of the standards that were governing our decision, but you're right. The Office of Insurance Regulation did approve the master agreement, 100%. But how did they approve it? They approved it because they had representations from Old Republic as to what was entailed with that master agreement. That occurred, right? That master agreement, this is going back to the fraudulent transfer claim, by the way. I'm out of time. May I finish answering the question? Yes, please. Okay. So the master agreement was submitted to Office of Insurance Regulation and that office did then approve the master agreement. Not represented, and we put this, it's in the record, it's in evidence, was the value of the title plan and the only interest stated by the Office of Insurance Regulation that they were concerned with was one class of creditors and that was title policyholders. But because of the financial crisis, this debtor had a lot of other creditors. There were defalcation claims, fraud claims, and those are most of the people that the creditor trusts. All these defalcations ended up being a problem because they're never going to get paid. And so by approving and avoiding a receivership under state law, under state receivership law, they avoided the legislature's decision as to how to deal with these various creditors and how to deal with these various issues through a statutory scheme and court oversight. There was no court oversight. All right. Thank you, Mr. Pollenberg, and you've reserved two minutes for rebuttal. We'll hear next from Mr. Goldsmith. Thank you, Your Honor. May it please the Court, my name is John Goldsmith and with me is Ryan Schultz and Laura Fernandez, and together we represent the appellees in this case. I think it's helpful because there are a lot of transactions here, just to briefly summarize them, that in 2008, the debtor was in severe financial trouble as a result of losses in their investments in the market and also because they had title agents that had stolen roughly $60 million. And as a result of that, they were about to lose their ability to issue new title insurance policies. And as a result of that, they entered into a joint venture agreement in which, as a result, the title plant that had a value of $10.7 million on the books and an older public holding issued essentially the same amount, $10 million and a note of $700,000. And that was approved by Florida OIR. All of the transactions involved here were approved by Florida OIR. The joint venture agreement in 2009, the 2011 agreement, the 2015 master agreement, they were all approved. But at the time of that transaction, they gave $10.7 million, but the debtor retained $240 million of assets, including $144 million in cash, undisputed. So when you talk about the issue of is there a mere continuation, is it a fraudulent transfer, they retained $244 million and they gave up $10.7 million. That was matched by OIR holding. But it does seem a bit unusual to be able to have a finding that there's no successor liability, but there is an alter ego. The finding by the court is that there was . . . the finding by the court . . . so you have to look at really two different things here. First is that the finding by the court is that . . . let me start here. First, in order for the trustee to succeed, they have to succeed on both alter ego and on successor liability. So they can't succeed on both. The central element of successor liability is not present in this case. There's no movement of assets out of the reach of the debtor's creditors for the benefit of identical owners. And the district court affirmed the bankruptcy court's decision that AFTS Services was not the successor in interest based on stipulated facts as well as undisputed facts. And again, the debtor retained $240 million of assets after giving up $10.7 million in assets. And in addition to that, in order for there to be a claim of successor liability, the debtor has to have been dissolved. The debtor was not dissolved. The debtor continued to operate independently from ATF Services, and they engaged in a completely different business. The debtor continued to be a title insurance company. They were prohibited with an agreement with the OIR. They couldn't issue new policies, but they continued to administer policies that were paid. ATF Services was not a title insurance company. It didn't issue any title insurance whatsoever. They simply provided services to title insurance agents. They did not issue title insurance policies. They were completely different. And the court only found one of the three elements necessary for successor liability and did not find the others. In addition, the trustee could not prevail on alter ego because the bankruptcy court and the district court affirmed, and it's not disputed, that ATF was run by its own management with appropriate independent oversight, held regular board meetings, and kept its business records in the ordinary course. And there was no basis that was presented by the trustee to disregard the corporate form. But this has to do with the 2009 transaction. And then in 2011, there was another transaction because the ATF Services lost $30 million, all funded by Older Public Holding. And so as a result of that, there was then a change, and it became a governance-only type of an arrangement. But the company was then owned entirely by OR Holding. But again, that was approved by the Florida OIR. Now, Mr. Polenberg said that he started by saying, well, there was a finding of fraudulent intent in the crime fraud exception. But what the court ruled on was not based on an evidentiary hearing. The crime fraud exception is only determined based on a prima facie showing. And it's not done after an evidentiary hearing. So there was nothing other than a prima facie showing by the debtor. And that had to do with the intent of OR Holding. But when you're looking at a fraudulent conveyance, a fraudulent conveyance looks at the intent of the debtor. So it's completely apples and oranges. It has nothing to do with the issues in this case. And we cited the Cone case, which is directly on point, where the court granted summary judgment on fraudulent transfer claim, despite an earlier ruling that the plaintiff had established a prima facie case for the crime fraud exception. And they rejected the trustee's attempt in that case to bootstrap the holding that the plaintiff made a prima facie case for the fraud crime exception into the law of the case of a fraudulent transfer. The court said, you can't do that. It's directly on point to the issues that we have here. The argument with regard to the 2015 master agreement is that the Pfeiffer opinion that the court, he claims, changed their decision, denied the Daubert motion, allowed Pfeiffer to testify, and then changed its opinion, and then did not rely on Pfeiffer's opinion. But what the court said in the hearing on the Daubert motion is that the court already denied plaintiff's motion to exclude Hazel, which is our experts, Old Republic's expert testimony, Hazel's rebuttal testimony. Hazel's rebuttal testimony will be very helpful to the court's consideration of whether Pfeiffer's opinion satisfies the Daubert standard. So the court clearly put them on notice that they were going to look at whether or not he met the Daubert standard. But what Mr. Pfeiffer testified to is he testified that, quote, I don't rely on textbooks. I rely on doing the valuations the way I always do it. The bankruptcy court could not have abused its discretion in refusing to consider the opinion of an expert that says, I just do them the way that I do it. And the court said, ips and dicks, and you can't just say because I said so. My understanding from counsel on the side is that the timing of the district court's ruling with respect to the expert testimony denied them the opportunity to cure whatever defect the court viewed was at issue. Is the timing of that expert decision not problematic? It's not problematic because, again, the court warned them in the Daubert ruling, I'm going to consider whether or not the opinion satisfied the Daubert standard at trial. And it's different in a jury case and a non-jury case. And as this court said in the US versus Brown case, that when the purpose of Daubert is for the judge to be a gatekeeper, so that you don't have junk science that's considered by the trier of fact. But what this court said in US versus Brown is that when the gatekeeper is keeping the gate for him or And so this is not an issue of they didn't have notice. They clearly did based on what the court said. But in addition to that, we then had his live testimony at trial where he said, I don't look at treatises. I don't look at textbooks. I don't look at any authorities. I do expert opinions. I do evaluations the way I always do. He's not a certified valuation expert. He had no expertise in the area. They were aware that this was an issue. And then the other thing is that Pfeiffer, in his valuation, lumped assets that the debtor did have with ones that they did not. And you pointed this out, Judge, that they included, for example, the debtor's workforce in the valuation. And the party stipulated the debtor's services in 2009. And so we're now six years later, and they're saying that that's something, that's an asset that could be considered. He included the title plant. But the debtor didn't own the title plant. The debtor owned a contingent right to the title plant. If certain things happened, they were entitled to a copy of the title plant. And that's what the court ruled they had. And also, it included certain marks and other intangible property, which was owned not by the debtor, but by the debtor's parent. So all of these are reasons why Pfeiffer's opinion was properly excluded. And the court did not abuse its discretion in failing to consider that opinion. We had our expert that gave an opinion. And our expert gave an opinion about value. And the court certainly properly could have considered that opinion and not considered the opinion as being more persuasive than the opinion of the trustee. Additionally, they've made the argument that, and let me just point out, again, the Florida Office of Insurance Regulation not only approved the master agreement in 2015, but when they looked at it at first, they said, we're not going to approve it because you're only assuming the responsibilities for debtor's title insurance policies. You also have to assume the responsibilities for the reinsurance. And so they changed the deal. They didn't just rubber stamp it. And they then approved it when we agreed to do it. But secondly, in connection with that transaction, we weren't the only offer. They had an offer from somebody else, SOBC, who agreed to pay $1, but didn't agree to put any new assets. They agreed to come in, operate the company, see if they could make it work, but they didn't agree to guarantee and put any more assets in. It's a very different situation. I want to address one other issue that was not directly raised in the opening, but they do raise it in their brief. And it has to do with the issue regarding the marks, where they moved under 15B to amend the pleadings to conform to the evidence, and that motion was denied by the court. They wanted to add a new claim, to claim that the debtor had transferred the marks, not to an old Republic company, but to its parent in 2011, and that that was not appropriate. And the court ruled it violated, that it exceeded the statute of limitations, so it was futile. And also it was futile because when you looked at all of the different badges of fraud, that even though they didn't pay anything when they transferred it to their parent company, both companies were solvent. That was stipulated to by the parties. And three, at the time of that transfer of the assets, there was a legitimate purpose to do it. The legitimate purpose of doing it was to keep that asset outside of older public's control. So they transferred it to the parent company to basically provide additional assets that would be available, so when they did the amended JVA, that wouldn't be something that older public would have. So it simply doesn't satisfy any of the requirements, and the court ruled the FDIC took over Washington Mutual, which was a creditor, and as a result of that, that statute didn't apply. So the court properly ruled and denied the Rule 15b motion. But even if it should have granted that motion, again, the FIFRS valuation included a number of assets that were not included, which was a workforce that hadn't been there in six years. It also included the title plant when they didn't own the title plant. He valued the title plant when the court made the determination, based on their arguments, that we have a contingent right to the title plant. So as a result of that, the court properly found, after a lengthy hearing with experts, that they had not established reasonably equivalent value. Reasonably equivalent value is the most important element of badges of fraud, because if you don't have reasonably equivalent, because if you do have reasonably equivalent value, there's no damages. You've transferred assets, you've got substantially the same thing in return. All right, thank you, Your Honor, you were right. It was after the close of evidence. That's when the court made its ruling. The court made an oral pronouncement, look, these are the things I'm going to consider, but then entered a written order, and the written order says what it says. If the defendants wanted to raise an objection to FIFR after the court ruled it was admissible, then they needed to do so, so that we had an opportunity to object, or lay a foundation, or under 103, make our proffer so that we could have it properly preserved. There was no objection, and we stand on our briefs as to why FIFR's opinion is proper and why the court shouldn't have excluded it, but certainly not after the close of evidence. It's not true that that the rules of evidence apply one way for a jury trial and one way for a non-jury trial. You have to have, procedurally, it's not true. Sure, you can have a relevancy objection, and if it's a judge trial, the judge will say, I'm going to be a little bit more broad and allow more in because I know what weight to give it, where the court might be a little bit more circumscribed when there's a jury, but the party makes that objection procedurally under 104. The court then decides whether it's admissible in the first instance under 104, and then the evidence is in. If this case was in front of a jury, that jury would have considered both experts properly. The court shouldn't have done what it did. It was wrong. It's abuse of discretion to not consider both experts at that point. The court wanted to reconsider its order and give us notice, and then give us an opportunity to be heard on that, and proffer what would be necessary. Sure, I guess the court could have done that because the court has broad discretion to try the cases as it seems fit, but in the end, it was fundamentally unfair. It was a violation of the creditor trustee's due process rights, and for those reasons and the reasons stated on the brief, we respectfully request the court reverse. Thank you. We are adjourned.